Lazar **KOPILOWITZ** et al., Appellants,

v.

**CITY OF EL PASO**, Appellee.

No. 4128.

Court of Civil Appeals of Texas.

Eastland.

March 31, 1967.

Rehearing Denied April 28, 1967.

Norman Rosen, Malcolm McGregor, El Paso, for appellants.

Travis White, City Atty., Hardie, Grambling, Sims & Galatzan, Peticolas, Luscombe & Stephens, W. C. Peticolas, El Paso, for appellee.

GRISSOM, Chief Justice.

Lazar Kopilowitz and K B S Realty Corporation sued the City of El Paso seeking to have their deeds to the City conveying seven sections of land in fee simple cancelled, or reformed so as to convey only the water rights thereunder. The case was submitted to a jury that answered only one question. That answer was in substance that the City represented to Plaintiffs before they conveyed said seven sections to it that to furnish the City with an adequate and wholesome supply of water, it was extending, improving and enlarging its waterworks system, including water supply reservoirs, riparian rights, standpipes and water sheds, and was digging and drilling water wells and constructing pump stations, water supply reservoirs, dams, drains, storm sewers and access roads, and constructing, building, erecting and establishing necessary appurtenances and facilities which would furnish to its inhabitants an abundant supply of wholesome water, and that it was necessary for said purposes that the City acquire the surface of the seven sections conveyed by the Plaintiffs in fee simple to the City. The jury failed to answer question number 2, which inquired whether such representation was false, or any other question. The judgment recites that before submission to the jury the City had filed a motion for an instructed verdict and the court, at the time of rendering judgment, was of the opinion that it should have granted such motion and, it further appearing, that the jury could not answer any question except the one stated, the court discharged the jury and granted the City's motion for judgment notwithstanding the inability of the jury to answer any other question. The cause was withdrawn from the jury; the jury's answer to issue number 1 was set aside and judgment was rendered for the City. Lazar Kopilowitz and K B S Realty Corporation have appealed.

Appellants sought to either cancel or reform appellants' deeds on the grounds that the City had falsely represented that it needed the surface, as well as the water rights, for development and protection of its water supply and that they relied thereon. The City answered by pleading the four year statute of limitation, ratification of the settlement agreement, estoppel, a general denial, and a special plea that appellants' land was acquired for the purpose of protecting and developing the water supply of the City, in other words that the representation found by the jury to have been made, was true. Many of appellants' points are to the effect that the court erred in rendering judgment for the City on the grounds that a determination by the City that the surface was needed was binding on appellants because the evidence showed that (1) no determination of need was ever made; (2) the amount of land taken was arbitrary and excessive and (3) that the deeds were obtained by fraud. Most of appellants' additional points present the contention in effect that the court erred in rendering judgment as it did because the evidence raised questions of fact as to whether the surface was needed for water purposes; whether the City's misrepresentation that it was needed for water purposes was a material misrepresentation; whether appellants relied thereon and whether appellants' cause of action was barred by the four year statute of limitation. Appellants also contend that the court erred in so rendering judgment against them on the ground that appellants were unable to restore the status quo; because appellants had not tendered the compensation they received for their land; because it was not shown, as a matter of law, that appellants had ratified the settlement agreement; because there was a fact issue as to whether appellants then had full knowledge of the City's fraud; because the court erred in holding appellants were estopped because they had voluntarily released their rights to retain the surface; because the evidence raised a fact issue as to whether the settlement agreement was procured by fraud and because appellants had failed to prove that they sustained pecuniary damages.

Appellee's first and second counter points are, respectively, that the court did not err in rendering judgment for the City because (1) determination by the City that the surface was needed is binding on appellants, in the absence of fraud or arbitrary action, and there was no evidence of fraud or arbitrary action and that (2) the evidence showed, as a matter of law, that there was no fraudulent representation because it was undisputed that appellants' land was needed for the City's water supply.

In 1952, the City adopted an ordinance creating the Public Service Board under authority of Art. 1115, to take over management and control of its water and sewerage system. Mr. Hugg was appointed General Manager of said board and continued in that capacity until October, 1958. In 1952 the Board was engaged in a drilling program on the Northeast mesa as well as the Canutillo area, trying to find a new source of water for the City. The Board was greatly concerned about a water supply for the City and its military facilities. The United States Geological Survey made available in 1953 a paper discussing water under the mesa. The Board was also interested in obtaining a bond issue to develop their water supply. Distinguished hydrologists were employed to prepare a report for the Board to present to the City and its voters as to where water was available in the area. The Board desired to acquire the surface and the water for the City's future water supply. The hydrologists recommended that the City get control of the ground water reservoir to prevent depletion by others. The Board determined that it needed the fee simple title to appellants' land and determined to acquire it, and others, if and when a proposed bond issue passed. In July 1954, the Council passed a resolution authorizing condemnation suits for the fee simple title to appellants' land for public use by its department of water and sewage. The United States Geological Survey demonstrated to the satisfaction of the Board and City that the water recharge area was on the land in controversy then

owned by appellants. Among the reasons that prompted the Board and City to determine that the surface of appellants' land was needed was the need to control the land above the water for location of pipelines, to prevent contamination, for access, for recharge, and to prevent others from depleting said water supply. Appellants' land is in the recharge area.

■ Other land, known as the Crump land, was being pumped. In order to stop pumping of water from under the Crump land, the City traded a half section, without water rights, for the half section owned by Crump and those pumps were shut down. El Paso Electric Company planned to build a power plant in New Mexico just above the Texas line and to drill its own water wells. It purchased 1046 acres there. The Board and City believed that water thus taken in New Mexico would result in depleting the water on the Texas side. The Board persuaded the Electric Company to move on City land and traded them such land for the water rights on the Electric Company's New Mexico land, however, leaving wells in Texas under the control of the City and preventing said Company from depleting the City's water supply. This trade, also, occurred after acquisition of appellants' land, but demonstrated the wisdom of the City and said Board in acquiring the surface of appellants' land. Before the bond election, for the purpose of procuring $20,000.00 which the Board had to have to obtain an option on seventeen sections owned by Price, the City agreed to sell two and one-half sections to Tempron Corporation. The City obtained the water rights under these two and one-half sections and Price's land. These are some of the deals that appellants point to in an effort to show that the City did not acquire the surface of their land for the purposes represented, but for the purpose of obtaining a monopoly on land adjacent to the City which it could sell to a desired industry. Appellants contend that the matters mentioned show that the representation that the City needed the surface for protection of

its water supply was false, or, at least, raised a question of fact as to its falsity. On the contrary, we think the record establishes that the land was acquired for the purpose of developing and protecting the water supply. In the first place the matters so relied on occurred after acquisition of appellants' land and could not have induced their action. Furthermore, the manager and some members of the Board did talk about selling excess land to industry, but it was determined that, if any sales were made, they would be made in such a way as to protect its water supply from contamination, protect the well sites and protect its locations for pipe lines. A sale of land was later made to Northrup. It is evident that it did not interfere with the well sites and pumping stations and that said Company was expressly required to prohibit radioactive waste being placed on the surface. Mr. Hugg testified that no part of appellants' land had ever been used for anything except a water supply for the City. There was no evidence to the contrary. The City did convey to the Electric Company a strip of land 50 feet wide over Sections 1 and 2, which formerly belonged to appellants, for their power line, but the City retained all water rights and put restrictions in the deed. A 200 foot strip was also conveyed to the Electric Company for its power line. Nevertheless, we conclude that the record establishes that the purpose of acquiring appellants' land was to protect and develop its water supply and that the representation found by a jury to have been made was true.

▪ The City was unable to agree with appellants on the purchase price for their land and filed three condemnation suits to acquire the fee simple title thereto. Mr. Kopilowitz testified that the City told him it wanted his land to carry out an overall plan to protect the underground water; that, although he was satisfied that the City didn't need the surface and instructed his lawyer to offer the City the underground water so he could keep the surface of the land, the City persisted in its contention that it needed the surface and, in settlement of the three condemnation suits he conveyed the fee simple title to the City, was paid $148,800.00 therefor, and the City, among other things, gave him an option to purchase 160 acres at the price the City paid for it. He testified, in substance, that before he accepted the consideration paid for his land, he learned something that he had always suspected, which made him think the City was not going to use the land for water but to sell to industry; that, therefore, he required a letter from the Board stating what it intended to use his land for. His purpose was to make sure his land would not be used for anything but a water supply. He received such a letter. He testified that he acquired the land on the mesa in 1944, as well as leases on T & P land; that they had between 25 and 30 sections; that he had it appraised in 1953; that he was represented by reputable lawyers in the condemnation proceedings and they are still his attorneys; that he considered them to be highly competent, but that they did not raise a question as to the City's right to take the surface, but he did; that he was not satisfied with the price fixed by the Commissioners and appealed; that he tried to get everything for his land that he could; that the City condemned it and he tried to salvage everything possible. In July, 1955, the parties hereto made an agreement settling their controversy. The City paid appellants $148,800.00 for their land, gave them an option to purchase from the City 160 acres at the price the City paid for it, gave appellants the first refusal of a grazing lease within two years, permitted them to remove an adobe shack, wire corrals, a steel tank and a windmill and to retain possession of their land until January 1, 1956. Thereafter, in July 1955, appellants conveyed the land to the City, but were permitted to retain the minerals. Appellants received and kept $148,800.00 for their land; they exercised their option to purchase 160 acres which they thereafter sold at a profit and which, of course, they can not return to the City. The three condemnation suits were

dismissed at the request of all parties. We conclude that appellants are estopped to assert a right to cancel and that they have ratified their deeds. Texas Company v. State, 154 Tex. 494, 281 S.W.2d 83, 91.

El Paso is a Home Rule City authorized to take fee simple title for sewer systems, reservoirs, water sheds, water supply sources, wells and water systems. Article 1175(15). By Article 1107 the City was authorized to condemn property for, among other things, the following purposes:

"2. To construct water mains, or supply reservoirs, or standpipes for water works or sewers."

"4. To construct and maintain sewer pipes, mains and laterals * * *"

"6. To dig or drill water wells * * * or produce water from or construct pump stations or reservoirs thereon * * *"

Article 16, Sec. 59 of the Constitution of Texas, Vernon's Ann.St. provides:

"The conservation and development of all of the natural resources of this State, including the control, storing, preservation and distribution of its storm and flood waters * * * the conservation and development of its * * * water * * *, and the preservation and conservation of all such natural resources of the State are each and all hereby declared public rights and duties; * * *."

Appellants' main contention is that there was no determination that the fee simple title was needed and, if so, that such finding was not binding on appellants, because the City did not acquire the surface for protection of its water supply but to enable it to sell that part of the surface not needed for water to industry. We agree with appellee that the record does not sustain that contention and that no question of fact was raised in support thereof. There was a determination by the City that the fee simple title was needed. A resolution of the City recited that its legal staff was authorized to file suit for condemnation of the fee simple

title to appellants' land "needed for public use by the Department of Water and Sewage." We are not called upon to determine whether there is merit to appellants' contention that there was no finding that other land was needed. We are directly concerned only with the land conveyed to the City by appellants. Said resolution shows it was determined by the City that the fee simple title to appellants' land was needed for public use by the water department of the City. In answer to appellants' further contention that there was, at least, a fact issue raised as to whether the surface was needed and a determination thereof made, appellee says that in determining this question we must consider facts that were apparent to the Board and City when such determination was made. Appellee says the Legislature determined the City's need for the surface in authorizing sale of 14,000 acres of public land to the City to expand its sources of water and protect its wells. We do not agree that this is controlling. However, the evidence establishes that the Board and City determined that the City needed the fee simple title to appellants' land to protect and develop its water supply. The record shows that when the settlement agreement was made appellants raised the question of the need of the City for the surface but the City refused to accept only the water rights and required the fee simple title. With this question in dispute, appellants chose to convey fee simple title to the City for the consideration agreed upon, which was paid. We agree with appellee that there was no evidence of fraud or arbitrary action on the part of the City, unless it can be said that the City did not need this land for development and protection of its water supply and that it acquired the surface for the purpose of selling land to industry it selected. In determining whether there was any evidence that the City acquired more than was needed for its water supply and the protection thereof, it should be remembered that both the Board and City act as a body and statements of their members are not binding on them. Webster v. Texas & Pacific

Motor Transport Co., 140 Tex. 131, 166 S. W.2d 75; Swink v. City of Dallas, (Tex. Com.App.), 36 S.W.2d 222; Camp v. Thomas, Tex.Civ.App., 26 S.W.2d 470, (writ ref.). We conclude that there was no evidence that when the City acquired appellants' land it intended to use it for any purpose other than the protection and development of its water supply. It is undisputed that, except for necessary public roads and utilities, it has been used exclusively for such purposes.

The minutes of the Board in December 1952, show it was then concerned about securing an adequate new or supplemental supply of water and that the City and the United States Geological Survey and the military authorities were undertaking to locate a new source of water. There was testimony that the Army, the Air Force and the City could not grow much more until a new supply of water was found. The minutes of the Board of 1952 show that the United States Geological Survey was then testing the City's wells to ascertain how long they would produce. The Board's minutes show that it was also concerned about the military and farmers drilling wells that might help deplete the City's water supply. Bids for drilling test wells were received in December, 1952. There were discussions by the Board as to whether the land should be annexed or purchased. Minutes of a later meeting of the Board show that the United States Geological Survey thought it would be wise for the City to buy the land where the test wells were being drilled; that the Board was in favor of buying the land and instructed its manager to discuss the matter with some major property owners. The manager of the Board, in February 1953, was authorized to obtain options on 50 sections of land discussed by the Board, including appellants' land. In June 1953, the Board specifically discussed purchasing appellants' land. Kopilowitz was then asking $255,000.00 for his land. Hugg was authorized to advise Tempron Corporation that the Board would sell it some land then owned by Price, if and when the Board acquired it from Price. In February 1954, the Board passed a resolution requesting the Mayor to sign an option agreement with Tempron on three sections. The City granted Tempron an option for $20,000.00 which it used to acquire an option on 17 sections owned by Price. After the settlement agreement of July 28, 1955, and after appellants had been paid for their land, the Board heard that Northrup wanted to purchase a section and one-half; that a sale to Northrup was made in December 1955, but it was made in such a way as to protect the water owned by the City, and no part of appellants' land was involved. In April 1955, Border Steel Rolling Mills explored the possibility of buying 265 acres out of Section 12. These facts are urged by appellants as showing that their land was not acquired for the purpose represented by the City and is urged by the City as showing the City's determination that it needed the surface of appellants' land. Appellee says, and we think correctly, that none of the facts deemed by appellants to constitute evidence that their land was acquired to sell to industry have any relation to appellants' land, except, possibly, the inquiry made by Border Steel Rolling Mills, nearly four years after appellants conveyed their land to the City. This could not be material or raise the issue suggested by appellants. The Tempron sale does not constitute evidence of a plan to acquire appellants' land to sell to industry. The Board was anxious to obtain an option on 17 sections of land owned by Price before bonds were issued. To do that it was required to obtain $20,000.00 option money. This was advanced by Tempron. In other words, Tempron got two and one-half sections of the City's land, with a protection of the City's water supply thereunder, and the City was thereby enabled to obtain the option money for 17 sections of Price's land. This does not tend to show that the City's purpose in acquiring appellants' land was to engage in land speculation. Appellants do nothing more than show that the Board used good business judgment in obtaining 17 sections from Price for its water supply.

For the City to obtain the T & P land by negotiation it was necessary for the Board to take all of its land in that area. Some of the T & P land was not suitable for water. Such excess non water producing land was acquired because T & P wouldn't sell just the land the City wanted. This is not evidence that the City did not obtain appellants' land for the purposes represented. The evidence shows that the land acquired by the City from the appellants was acquired for and has always been used only for water and that it is, at least in part, in the recharge area. There is much further discussion of similar matters in the briefs, such as the mentioned trade by the City with El Paso Electric Company. None of those things, in our opinion, constitutes evidence that the City acted arbitrarily or fraudulently, or that the land was acquired for any purpose other than to preserve and protect its water supply. We conclude that the City's representation, found by the jury, was true. There was no evidence to the contrary. Wagoner v. City of Arlington, Tex.Civ.App., 345 S.W.2d 759, (Ref. n. r. e.); City of Dallas v. Malloy, Tex.Civ.App., 214 S.W.2d 154, (writ dism.); West v. Whitehead, Tex.Civ.App., 238 S.W. 976, (writ ref.); McInnis v. Brown County Water Improvement District No. 1, Tex. Civ.App., 41 S.W.2d 741, 745, (writ ref.); The McInnis case upheld the right of a water district to take the fee simple title and held that the extent of the estate taken for public use presented a legislative not a judicial question. See also Meaney v. Nueces County Navigation District No. 1, Tex.Civ.App., 222 S.W.2d 402 (writ ref.); Goldsmith v. Cathey, Tex.Civ.App., 331 S. W.2d 358, (ref. n. r. e.).

We conclude there was no evidence of fraud, or arbitrary or capricious action by the City, nor that the representation that appellants' land was to be used for the protection and development of the City's water supply was false. We further hold that there was no evidence that appellants relied upon the alleged false representation. On the contrary, Kopilowitz' testimony shows

that at the time he conveyed his land to the City he knew all the material facts about the alleged false representation, upon which he alleged he relied, as he knew at the trial. The evidence concerning later transactions was not material on that issue. We agree with appellee that appellants should not be permitted, with such knowledge to make the settlement agreement and obtain its benefits and then to rescind the transaction, after they had made it impossible to return what they had thereby obtained.

We have considered all of appellants' points. We conclude that none of them present reversible error. They are overruled. The judgment is affirmed.